**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES ANDERSON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:04cv0815 SNL** |
| | ) | **TCM** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying the

applications of James Anderson, Jr., for disability insurance benefits ("DIB") under Title II

of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security

income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Mr.

Anderson ("Plaintiff") has filed a brief in support of his complaint[1]; the Commissioner has

filed a brief in support of her answer.  The case was referred to the undersigned United States

Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

---

[1]Plaintiff captioned this pleading as a motion for summary judgment.  Rule 9.02 of the Local
Rules of the Eastern District of Missouri requires leave of Court before a motion for summary
judgment may be filed in a social security appeal.  Leave of Court was not requested.  Consistent with
Rule 9.02, the undersigned will construe Plaintiff's motion as a brief in support of his complaint.

## **Procedural History**

Alleging a disability since August 3, 1998, caused by back problems, hip and neck pain, and depression, Plaintiff applied in August 2002 for DIB and SSI. (R. at 25-28, 68-70.[2]) His applications were denied initially and after a hearing before Administrative Law Judge ("ALJ") H. Lloyd Kelley III. (Id. at 11-20, 22, 38, 56-59.) The Appeals Council then denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 2-4.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel; his wife, Lenora Anderson; and Jeffrey F. Magrowski, Ph.D., testified at the April 2003 hearing. (Id. at 930-72.)

Plaintiff testified that he was born on December 22, 1947, was 6 feet 4 inches tall, and weighed 195 pounds. (Id. at 935.) He went only as far as the second or third grade in school and could not read or write. (Id. at 935-36.) He studied for his GED when incarcerated on a child molestation conviction but did not obtain it. (Id. at 937, 965.) He and his wife live in an apartment. (Id. at 963.)

His last job before his incarceration was as a welder and loader at JFM Risk Construction Company. (Id. at 937.) His work as a loader required that he load steel on a truck to be taken to the job site. (Id.) His job before that was as a welder at Wells Iron Works. (Id. at 938.) This required a lot of bending and stooping. (Id. at 939.) It also

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

required that he move quickly.  (Id.)  His two factory assembly jobs at Chrysler also required that he move quickly.  (Id. at 940.)

Asked about his typical day, Plaintiff reported that he did not sleep well.  (Id. at 941.)  Although he takes medication to help him sleep, he only sleeps for about six hours.  (Id.)  Approximately ten years ago, he slept for eight or nine hours.  (Id.)  His appetite had also decreased.  (Id. at 942.)  He ate only one meal a day.  (Id.)  He used to eat two or three meals a day.  (Id.)

He gets up with his wife in the morning and sees her off to work at 6:30 in the morning.  (Id.)  He then goes back to bed and wakes up again at 10:00 in the morning, lies in bed, and watches television.  (Id. at 942-44.)  After a news program ends at 11:00, he sleeps on and off until he gets up to do some chores and eat some lunch.  (Id. at 944-45.)  He sometimes has fruit to eat.  (Id. at 946.)  After lunch, he returns to bed and watches television.  (Id.)

Plaintiff further testified that he always hurt in his lower back, right hip, and right knee.  (Id. at 942-43.)  His right knee was swollen.  (Id. at 943.)  It had been drained only three weeks before.  (Id.)  Fluid had also been drained from his knee while he was incarcerated.  (Id. at 944.)  Lying down and sleeping helps relieve his back pain.  (Id. at 948.)  Medication also helps; he takes it daily.  (Id. at 948-49.)  The medication helps relieve his hip and knee pain, although it does not eliminate it.  (Id. at 949.)  Plaintiff's neck and right shoulder also hurt, and have done so since he was involved in an accident in 1998 when he was being transported from St. Louis County to the penitentiary.  (Id. at 950-51.)  The van

he was riding in rolled over, pinning Plaintiff to the door.  (<u>Id.</u> at 952-53.)  He has been told he has arthritis in his right shoulder.  (<u>Id.</u> at 950.)

Additionally, Plaintiff has difficulty urinating.  (<u>Id.</u> at 953.)  There was talk of surgery to relieve the problem when he was incarcerated.  (<u>Id.</u> at 954.)  The surgery was not performed due to his heart not functioning well.  (<u>Id.</u>)  He has been given medication for the urination problem but it does not help.  (<u>Id.</u>)

Plaintiff used to enjoy bowling.  (<u>Id.</u> at 946.)  He can no longer do it because it requires bending and stooping and he can do neither.  (<u>Id.</u>)  He has difficulty climbing stairs.  (<u>Id.</u> at 955.)  He also no longer enjoys visiting people.  (<u>Id.</u> at 948.)  He does attend church services on Tuesday and Friday nights and on Sunday.  (<u>Id.</u> at 960-61.)  The length of services varies and can last two hours.  (<u>Id.</u> at 961.)  The pews are padded so he does not have a lot of difficulty sitting through the service.  (<u>Id.</u> at 966.)  Even so, he often wants to leave during a two-hour service to go home and lie down.  (<u>Id.</u>)  After Sunday services, he and his wife go to their daughter's house for a meal.  (<u>Id.</u> at 964.)  Approximately once a week, he visits his oldest brother, a minister.  (<u>Id.</u>)  Once a month, he visits his oldest sister.  (<u>Id.</u>)  He cooks breakfast food for himself.  (<u>Id.</u> at 962.)  He also loads and unloads the dishwasher, vacuums the house once a month, and sweeps two or three times a month.  (<u>Id.</u> at 963.)

Plaintiff testified that he could comfortably lift 25 pounds, frequently lift only 15, and frequently carry only 15.  (<u>Id.</u> at 956.)  He could not walk farther than a few blocks without his left leg hurting; he could stand no longer than an hour without his back and legs hurting;

he could sit no longer than an hour without experiencing extreme pain.  (<u>Id.</u> at 956-57.)  To

relieve the pain created by walking too far, he would have to sit down, perhaps for the rest

of the day.  (<u>Id.</u> at 957.)  To relieve the pain created by standing too long, he would have to

lie down.  (<u>Id.</u>)  Pushing and pulling also cause him pain.  (<u>Id.</u> at 958-59.)  He cannot crawl

because of the tenderness in his knee.  (<u>Id.</u> at 959.)

Plaintiff no longer drinks alcohol and does not smoke.  (<u>Id.</u> at 965.)

Lenora Anderson stated that her testimony would mirror Plaintiff's as to his activities

and pain.  (<u>Id.</u> at 967.)  She can see that he is in pain.  (<u>Id.</u>)  He does not want to do anything

and has mood swings.  (<u>Id.</u>)  Plus, he has no income.  (<u>Id.</u> at 968.)  If he could work, he

would.  (<u>Id.</u>)  She has seen the swelling in his right knee.  (<u>Id.</u>)

Dr. Magrowski testified as a vocational expert ("VE").[3]  The ALJ described a

hypothetical person as follows:

> If we had a hypothetical individual the Claimant's age, education, training, past
> relevant work experience, if the individual were limited to occasionally lifting
> 25 pounds, frequently lifting 15 pounds, occasionally lifting 25 pounds,
> frequently carrying 15 pounds, the individual needed an alternate sit/stand
> option, with no frequent stooping, bending, or squatting, no regular – make
> that no regular or frequent climbing, stooping, bending, and squatting.  No
> regular or frequent ascending or descending of stairs.  Would there be jobs
> such a hypothetical person could perform into which the Claimant would have
> any transferable skills?

(<u>Id.</u> at 970.)  Dr. Magrowski replied that there were such jobs.  (<u>Id.</u>)  Plaintiff would have

transferable skills in welding, painting, and assembly-type skills that would transfer to

---

[3]Plaintiff stipulated to Dr. Magrowski's qualifications as a VE.  (<u>Id.</u> at 969.)

fabrication or assembly work. (<u>Id.</u>) Twenty thousand such jobs existed in the state economy; one hundred thousand such jobs existed in the national economy. (<u>Id.</u>)

If, however, Plaintiff's and his wife's testimony about his complaints and limitations were fully credible, there were no jobs Plaintiff could perform. (<u>Id.</u> at 971.) Such testimony included references to trouble urinating, crying spells, and a need to frequently lie down. (<u>Id.</u>) The first two limitations without the need to frequently lie down but with the additional factors of Plaintiff's age and limited education would preclude employment. (<u>Id.</u>)

## Medical and Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, and records from various health care providers.

A notation on a "Disability Report – Field Office" indicates that Plaintiff could not read or write. (<u>Id.</u> at 113.) His wife had to help him with the interview questions. (<u>Id.</u>)

Plaintiff indicated on a "Disability Report Adult" that he had back problems, pain in his hip and neck, and depression. (<u>Id.</u> at 116.) These problems first bothered him on August 3, 1998, and prevented him from working as of that date. (<u>Id.</u>) Plaintiff further indicated that he had seen a health care provider for both his physical and mental illnesses. (<u>Id.</u> at 118.) The majority of his medical treatment had been received at the Farmington Correctional Center ("FCC"). (<u>Id.</u> at 119, 121.)

Plaintiff reported in a claimant questionnaire that any movement caused him pain. (<u>Id.</u> at 77.) To ease this pain, he lies down or takes medication; however, the pain never

- 6 -

completely goes away. (Id.) This pain makes it difficult for him to sleep. (Id. at 78.) He is able to do some cleaning, but is not able to do any household repairs, ironing, mopping, or yard work. (Id. at 78-79.) Before he was injured, he enjoyed outdoor activities. (Id. at 79.) In a pain questionnaire, Plaintiff identified his lower back, right hip, and testicles as the location of his pain. (Id. at 81.) This pain has limited his activities for four years. (Id.)

On another form, Plaintiff listed recent medical treatment by Dr. Michael H. Bross with the Pine Lawn Health Center. (Id. at 71.) Dr. Bross had been treating Plaintiff for his back, hip, leg, neck, shoulder, and prostate problems. (Id.) He had prescribed Zoloft for Plaintiff's depression. (Id. at 72.)

An earnings report generated for Plaintiff listed income for all but one of the 24 years included. (Id. at 60.) His highest annual earnings were $45,084.45, in 1996. (Id.) His last reported earnings, in 1998, were $29,776.38. (Id.)

The medical records before the ALJ begin with Plaintiff's records from the Missouri Department of Corrections. (Id. at 126-261, 277-891.)

As noted above, Plaintiff was in an accident on August 20, 1998, when being transported to prison. His right wrist was placed in a splint. (Id. at 319.) The entire right side of his body hurt. (Id.) He was unable to raise his right arm above his shoulder without severe pain. (Id.) He was able to urinate without difficulty. (Id.) He had pain in the back of his head that radiated down the right side of his body. (Id.) He also had chest pain. (Id.) An x-ray was taken of his right wrist on August 24. (Id. at 318.) The findings were of an old trauma. (Id.) An Intake Mental Health Screening form marked as not present any factors

relevant to a risk of suicide or a history of psychiatric problems. (Id. at 854.) Neither the box labeled "No Mental Health Problems" nor the box labeled "Mental Health Problems Requiring Routine Follow-up" were marked. (Id.)

On September 1, Plaintiff complained of back pain with change of position. (Id. at 315.) It was caused by the accident. (Id.) On September 11, Plaintiff complained of mid-sternum and neck pain. (Id. at 312.) He moved his neck cautiously. (Id.) Plaintiff reported to sick call on September 18 with complaints of acute stress disorder, neck pain, and headaches as a result of the accident. (Id. at 126.) He was not referred to a doctor. (Id.) On September 30, Plaintiff reported that he had been in constant pain since the accident. (Id. at 310.) He did not look in distress. (Id.) He also reported that it took him awhile to fall asleep. (Id.) On October 1, a doctor concluded that Plaintiff's neck and back pain was probably caused by stress. (Id. at 312.) On October 12, Plaintiff complained of back pain caused by the accident and testicular pain when urinating. (Id. at 309.) A transfer screening sheet dated October 13 listed Plaintiff's only chronic condition as acute stress disorder. (Id. at 856.) On October 14, Plaintiff complained of right wrist pain caused by the accident. (Id. at 307.) X-rays indicated that the wrist injury was older than alleged, but Plaintiff denied this. (Id.) On November 20, Plaintiff complained of a painful left testicle and of urinary frequency. (Id. at 305.) Plaintiff complained again on December 15 of severe testicular pain.[4] (Id. at 296.)

_____

[4]It was also thought that he had a mass on his right kidney. (Id. at 298.) A computed tomography ("CT") scan found no mass. (Id. at 296.)

- 8 -

A January 5, 1999, testicular ultrasound was negative.  (Id. at 295.)  On February 2, Plaintiff complained of back pain.  (Id. at 294.)  He did not have an abnormal gait.  (Id. at 293.)  On February 4, Plaintiff was given Tylenol for his pain.  (Id. at 291.)  It was noted that x-rays of his spine taken in November 1998 had shown only mild to moderate spondylosis at C5-C6.  (Id. at 291, 303.)  There was also a degenerative change at C5-C6.  (Id. at 303.)  No abnormalities were seen in his lumbar spine.  (Id. at 303-04.)  On March 24, Plaintiff requested more Tylenol for his back pain.  (Id. at 509.)  He had been taking more than was prescribed and was told to follow instructions.  (Id.)  On April 30, Plaintiff complained of neck and low back pain and was prescribed Ibuprofen.  (Id. at 507.)

Plaintiff reported to a doctor on May 28 that he had not been able to urinate for over 24 hours.  (Id. at 504.)  Laboratory tests were scheduled.  (Id.)  After Plaintiff was able to produce a normal stream of urine, the doctor opined that inaccurate and misleading information had been deliberately furnished.  (Id. at 825.)  When Plaintiff next spoke with the doctor, he became angry and the visit was terminated.  (Id. at 500.)  The nurse noted during a June 7 visit that "extensive diagnositec [sic] testing and evaluation" had not revealed the source of Plaintiff's pain.  (Id. at 320.)  Because there might be a psychiatric component to his complaints, he was to be referred to the psychology service.  (Id.)  An August 4 physical examination was positive for multiple joint pain, vertigo, and hypertension.  (Id. at 283.)  Plaintiff complained of a lack of urinary pressure.  (Id. at 284.)  Three weeks later, there was no hypertension or vertigo.  (Id. at 286.)  In October, Plaintiff reported difficulty urinating and chronic low back pain.  (Id. at 494.)  He alleged that his testicles were tender;

however, this allegation could not be physically corroborated.  (Id.)  A December x-ray of Plaintiff's lumbar spine showed a disc space narrowing at the L5-S1 level.  (Id. at 484.) These findings were similar to those from an x-ray taken in November 1998.  (Id.)

On January 27, 2000, Plaintiff was informed that his last PSA (prostrate-specific antigen) was normal.  (Id. at 476.)  A rectal exam revealed a normal size prostate.  (Id.)  He was described by the doctor at the February 2 sick call as being "very vehement about pain." (Id. at 792.)  On February 11, Plaintiff reported that he was continuing to have low back pain although he had been treated for this for over one year.  (Id. at 472.)  His exam was described as normal, as was his ability to ambulate.  (Id.)   On May 10, Plaintiff reported that he was having problems with his feet swelling and his back hurting.  (Id. at 466.)  On May 26, Plaintiff complained of being lightheaded and dizzy and of headaches.  (Id. at 463.)  He was described on May 29 as being very evasive and reportedly had "a lot of somalization."  (Id. at 768.)

On June 1, Plaintiff had no complaints.  (Id. at 462.)

An MRI of his lumbar spine on June 5 indicated a multiple degenerative disc disease with some mild spinal canal narrowing.  (Id. at 461.)  This narrowing might be congenital. (Id.)  On June 14, Plaintiff was informed of these results.  (Id. at 460, 765.)  On August 11, a doctor prescribed Elavil for Plaintiff's pain.  (Id. at 453.)   On August 31, Plaintiff complained to a doctor of lack of urinary control.  (Id. at 452.)  He had flank pain on palpation and an enlarged right testicle.  (Id.)  On September 10, Plaintiff reported a history of back pain.  (Id. at 446.)  He further reported that he was okay as long as he had his

medications and was worried about running out of them. (Id.) A September 28 examination conducted pursuant to Plaintiff's complaints of pain was normal. (Id. at 446-47.)

On October 20, Plaintiff complained of hip and back pain. (Id. at 438.) His back examination was normal. (Id.) He was able to normally heel and toe walk, squat, kick, and flex and extend. (Id.) He was tender over his lower left lumbar spine. (Id.) Laboratory tests were "essentially normal except for creatinine." (Id. at 725.) Plaintiff was given some exercises to do for his back. (Id.) On November 7, Plaintiff reported that he was doing fine on his medications. (Id. at 428.) On December 21, Plaintiff expressed concern that his psychiatric medications would soon expire. (Id. at 145.) He had had no flash backs to the accident when on the medication. (Id.) His sleep and appetite were good. (Id.) Six days later, Plaintiff reported that his right leg was frequently swollen and that both the leg and his right foot were not the same size as his left leg and foot. (Id. at 427.) The asymmetry was explained. (Id.) An x-ray indicated a narrowing of the disc space at L5-S1. (Id.)

On January 13, 2001, Plaintiff completed a medical services request for the renewal of his psychiatric medication. (Id. at 683.) He reported a good mood, concentration, energy, and sleep. (Id.) His appetite was good. (Id.) Plaintiff was referred on February 17 to the FCC consulting psychiatrist, Mohammed Qaisrani, M.D., and diagnosed with major depressive disorder, recurrent, and posttraumatic stress disorder. (Id. at 682.) Plaintiff was to be continued on a previously-prescribed medication, Amitriptyline, and was to be referred to the psychology service for therapy. (Id.) One month later, he again was seen by Dr. Qaisrani. (Id. at 679.) After this visit, Dr. Qaisrani discontinued the Elavil due to side

effects, including urinary retention, and to Plaintiff's history of headaches and hypertension. (Id.) Plaintiff was to be started on a trial of Zoloft. (Id.) Two days later, Plaintiff requested that he be allowed to keep his medication in his cell, as he had done at another correctional center. (Id. at 143.) He appeared to be in pain. (Id.) On March 24 and again on March 26, Plaintiff complained of difficulty voiding. (Id. at 251-52, 418.) On April 9, Plaintiff was examined and was prescribed Septra. (Id. at 246.) His prostate was two times normal size. (Id.) On April 14, Plaintiff was again seen by Dr. Qaisrani. (Id. at 676.) His diagnosis was changed to major depressive disorder, recurrent without psychotic features, and with no reference to posttraumatic stress disorder. (Id.) Dr. Qaisrani increased Plaintiff's dose of Zoloft, noting that he still had active depressive symptoms. (Id.) On April 30, Plaintiff informed his therapist that he was continuing to have severe pain in his back and leg. (Id. at 142.) He was worried about running out of medication. (Id.) He was frustrated. (Id.) On May 5, Plaintiff reported to a doctor that he was "getting sicker." (Id. at 141, 674.) His appetite was not adequate, his sleep was. (Id. at 141.) He was experiencing intermittent dizziness and was having urinary problems. (Id. at 674.) He was calm and cooperative during the psychiatric evaluation, although his affect was constricted and anxious to depressed. (Id.) His stated mood was "depressed." (Id.) As during the April 14 evaluation, his concentration was impaired; his insight and judgment appeared fair. (Id.) Dr. Qaisrani continued Plaintiff on Zoloft. (Id.)

On May 14, Plaintiff reported that he had increasing difficulty urinating over the past six months and could then void only when sitting down. (Id. at 443-44.) On May 31, the

examining doctor noted that Plaintiff's prostate was enlarged.  (Id. at 241.)  He recommended a referral to a urologist.  (Id.)  A catherization performed four days later showed a distended bladder.  (Id. at 243.)  On June 25, Plaintiff reported having difficulty voiding.  (Id. at 239.)  He could do so in the morning without trouble, but not later.  (Id.)  He was also having low back pain unrelated to the voiding problem.  (Id.)  His lower spine appeared to be painful on movement.  (Id.)  On July 13, Plaintiff reported being sick, tiring easily, and having aches and pain all over.  (Id. at 238, 405.)  He apparently had a low pain threshold.  (Id.)  With the exception of an x-ray showing a degenerative joint disease at L4-L5, the physical examination was negative.  (Id.)  On July 31, Plaintiff reported that he had difficulty urinating during the day.  (Id. at 434.)  On August 2, Plaintiff again complained of aches and pains all over and of a burning and hesitancy when urinating.  (Id. at 234.)  His prostate was of normal size and consistency; no objective abnormal findings supported his complaints.  (Id.)  Two weeks later, Plaintiff complained about severe, increasing pain in his right hip, lower back, and legs.  (Id. at 138.)  He was also incontinent.  (Id.)  There were no overt symptoms of psychosis, panic, or mood swings.  (Id.)  There had been a misunderstanding about the medication schedule and Plaintiff had not been taking his nightly dose of psychiatric medication.  (Id.)  On August 25, Plaintiff's appetite and sleep were described as "adequate."  (Id. at 137.)  He was, however, anxious.  (Id.)  He was not receiving his medications on time.  (Id.)  In September, Plaintiff was isolated for eleven days to determine whether he had tuberculosis.  (Id. at 206-16, 374-94.)  The nurse observed him several times walking with a steady gait.  (Id. at 207, 209,222, 223.)  He complained on one occasion of

back pain. (<u>Id.</u> at 214.) He was released when it was determined that he did not have tuberculosis. (<u>Id.</u> at 374.)

On October 16, Plaintiff stated he was doing "fairly well." (<u>Id.</u> at 182, 349.) On November 7, Plaintiff complained to a doctor of multiple aches and pains. (<u>Id.</u> at 179, 347.) A physical examination was "essentially negative." (<u>Id.</u>) The next week, Plaintiff and his therapist discussed his continuing pain. (<u>Id.</u> at 135.) He appeared depressed. (<u>Id.</u>)

In January 2002, an ultrasound and biopsy were approved to determine the cause of Plaintiff's urinary hesitancy and retention and his elevated PSA. (<u>Id.</u> at 176, 344.) A cystoscopy was an option, but was cancelled after Plaintiff refused to have it performed without anesthesia. (<u>Id.</u>) The anesthesia could not be administered due to Plaintiff's bradycardia, or slow heartbeat. (<u>Id.</u>) The bradycardia was resolved when Plaintiff was taken off a medication. (<u>Id.</u>) The referring doctor concluded that the cystoscopy was premature and might not be necessary. (<u>Id.</u> at 175, 343.)

Plaintiff reported on March 5 that he had been having chest pain for a month and it was getting worse. (<u>Id.</u> at 173, 340.) A chest x-ray taken on March 18 was normal; an EKG showed no acute changes. (<u>Id.</u> at 170.) On March 27, Plaintiff reported to a doctor that he was having difficulty sleeping because of physical pain and nightmares. (<u>Id.</u> at 132.) His appetite was fine. (<u>Id.</u>) He was to continue on Trazadone and Zoloft. (<u>Id.</u>) On May 1, Plaintiff complained to a nurse of back pain. (<u>Id.</u> at 188.) The next week, Plaintiff informed a doctor that he was waking up with nightmares caused by the 1998 accident. (<u>Id.</u> at 131.) He was having to force himself to eat. (<u>Id.</u>) That same day, Plaintiff was seen by a therapist.

(Id.) He reported his appetite was fine; his sleep was poor. (Id.) He had no overt symptoms of panic, psychosis, or mood swings. (Id.) He appeared to be mentally stable, but the therapist recommended continuing psychiatric treatment. (Id.) On June 6, Plaintiff consulted a nurse about his blood pressure and chronic back pain. (Id. at 159.) He had a steady gait and no distress. (Id.) His blood pressure was within normal limits. (Id.) He was prescribed Tylenol for his back pain. (Id.)

On June 19, Plaintiff reported that the change of medications from Trazadone to Elavil had helped. (Id. at 130.) The next month, on July 16, Plaintiff reported to a doctor that he did not have any problems with sleep or appetite. (Id.) He was not on any pain medications and felt sad and lonely because of his pain. (Id.) The next day, the therapist recommended that Plaintiff's psychiatric services be continued. (Id. at 128.) At this appointment, Plaintiff reported that he was not doing well. (Id. at 129.) He had not had any medication for his pain for a month. (Id.) He was not sleeping well. (Id.) He was still having difficulty urinating. (Id.) The nurse recommended he come to sick call that day. (Id.) He related his mental health problems to his physical problems and denied any homicidal or suicidal ideation. (Id.) It was noted that Plaintiff had been diagnosed with anxiety disorder, NOS ("not otherwise specified"). (Id. at 129, 708.) Plaintiff reported that the psychiatric medications were helping. (Id. at 129.) On July 24, Plaintiff was noted to have a history of hypertension and atypical chest pain. (Id. at 160, 330.) He also complained of difficulty urinating. (Id.) On July 31, Plaintiff consulted the doctor about left ear pain. (Id. at 155.) He was diagnosed with otitis media and prescribed amoxicillin. (Id.)

At his last appointment with the doctor before his release on August 6, Plaintiff denied any psychiatric symptoms.  (Id. at 128.)  He expressed frustration with his continuing physical problems, e.g., his pain and difficulty urinating.  (Id.)  He was to be continued on Zoloft and Elavil.  (Id.)

Plaintiff consulted the Pine Lawn Health Center shortly after his release on parole in August.  (Id. at 271.)  On August 30, he reported that he had done well when taking Zoloft and Elavil in prison and needed a refill.  (Id. at 271-72.)  He had a history of marijuana and alcohol abuse but was attending Narcotics Anonymous and Alcoholics Anonymous as a condition of his parole.  (Id. at 271, 922.)  He also had a history of high blood pressure and depression.  (Id. at 272.)  His medications were renewed.  (Id.)  On September 27, Plaintiff complained of chronic back pain and being out of medication.  (Id. at 270, 921.)  He was given prescriptions for Celebrex and Flexeril.  (Id. at 920.)  On November 8, Plaintiff returned with complaints of being unable to urinate without pain.  (Id. at 918-19.)  Laboratory tests for his calcium and PSA were taken.  (Id. at 918, 926.)  Both were within normal limits.[5]  (Id. at 926.)

On December 20, Plaintiff went to the Urgent Care Center at St. Louis ConnectCare with complaints of pain in his neck and right shoulder for the past three days.  (Id. at 902-04.)  He was diagnosed with a cervical strain and was prescribed Motrin, Flexeril, and heat compresses.  (Id. at 903.)  He was instructed to follow up in one or two weeks with his primary care physician.  (Id. at 902.)  At least four weeks later, on January 31, 2003, Plaintiff

---

[5]The PSA that had caused concern at FCC was 6.  Plaintiff's November 2002 PSA was 2.01.

went to the Urgent Care Center with complaints of back, right hip, and right knee pain.  (Id. at 897-99.)  He reported that he injured his back in a motor vehicle accident in 1997 and had been having chronic pain since then.  (Id. at 899.)  His right leg and hip had been hurting for more than one week.  (Id.)  He was described as a poor historian.  (Id.)  He was then taking Motrin and Zoloft.  (Id.)  Manipulation of his right hip and right knee caused pain.  (Id. at 898.)  His right knee was slightly swollen.  (Id.)  The diagnosis was arthritis.  (Id.)  Plaintiff was given a prescription and instructed to attend a clinic for follow-up care.  (Id. at 897-98.)

The same day Plaintiff went to the Urgent Care Center, January 31, he did not keep his appointment at the Pine Lawn Health Center.  (Id. at 917.)  He did go there four weeks later with complaints of chronic back pain radiating to his right thigh and swelling and pain in his right knee.  (Id.)  Clear joint fluid was removed from his knee joint and sent to the laboratory for testing.  (Id.)  His Celebrex was replaced with Indocin and his Amitriptyline was renewed.  (Id. at 916.)  An x-ray of his knee revealed no fractures, dislocation, bone destruction, or significant arthritic changes.  (Id. at 915.)  On March 25, Plaintiff complained of low back pain and difficulty urinating.  (Id. at 912-14.)  An x-ray of his lumbar spine showed a moderate disc disease at L5-S1 and L4-L5.  (Id. at 913.)  He also had osteoarthritis in his facet joints and at L5-S1.  (Id.)  The diagnosis was degenerative disease in his lower lumbar spine.  (Id.)

The records before the ALJ also included the report of a consultative examination performed in September 2002 by Elbert H. Cason, M.D.  (Id. at 262-67.)  Plaintiff listed his complaints as low back pain, right hip pain, back and neck pain, and depression.  (Id. at 262.)

He took no medication for the pain, but did take medication for his depression.  (Id.)  He was taking Ranitidine, Adalat, Amitriptyline, and Zoloft.  (Id.)  Plaintiff reported that he used no tobacco, alcohol, or street drugs.  (Id. at 263.)  His blood pressure was excellent.  (Id.)  On examination, Plaintiff had a decreased range of motion in his back, paravertebral tenderness in his lumbar region, and a decreased straight leg raise in his right leg.  (Id.)  His lumbar spine flexion was 70 degrees flexion and extension and lateral flexion and 15 degrees right and left.  (Id. at 264, 267.)  His cervical spine range of motion was normal, as was his grip strength.  (Id.)  His right hip motion was decreased, his left was not.  (Id. at 264.)  An x-ray of his right hip indicated no significant abnormalities.  (Id. at 265.)  He did not have any muscle spasms and could squat, heel and toe stand, and walk with a normal gait without any assistive device.  (Id. at 263.)

Also in September, Terry L. Dunn, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff.  (Id. at 96-109.)  He listed two categories of disorders: anxiety-related disorders and affective disorders.  (Id. at 96.)  Neither was severe.  (Id.)  Neither limited his functioning.  (Id. at 106.)

In October 2002, Kimberly Kaemmerer, a counselor with the State of Missouri's Section of Disability Determinations, completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff.  (Id. at 88-95.)  She listed "degenerative joint disease" as the diagnosis and assessed Plaintiff's exertional limitations as being able to occasionally lift 50 pounds, to frequently lift 25 pounds, and to stand, walk, or sit for 6  hours during an 8-hour workday.  (Id. at 89.)  He was limited in his ability to push or pull with his lower

extremities.  (Id.)  He was also limited in his ability to crouch.  (Id. at 90.)  Plaintiff had no environmental, manipulative, visual, or communicative limitations.  (Id. at 91-92.)

## The ALJ's Decision

After summarizing the medical evidence and the lay testimony at the administrative hearing, the ALJ noted that Plaintiff's symptoms from posttraumatic stress disorder were "greatly improved" on medication.  (Id. at 14.)  This stress disorder and Plaintiff's depression were, the ALJ concluded, not severe when Plaintiff received appropriate treatment and resulted in no more than a mild limitation on his activities of daily living, social functioning, concentration, persistence, or pace.  (Id. at 14-15.)  Plaintiff did experience episodes of decompensation when in prison, after the accident, and after the termination of his substance abuse, but had not experienced such episodes after his release from custody.  (Id. at 15.)  Moreover, his isolation and social limitations were related to his physical problems and his identification as a child molester and sex offender.[6]  (Id.)

The ALJ further concluded that Plaintiff's physical problems, specifically, his back and joint pains, were severe impairments within the meaning of the Act and its regulations, but did not meet or equal the criteria for listing-level severity.  (Id.)  Additionally, Plaintiff was able to use his hands and arms and walk without assistance.  (Id.)  There was no evidence of reflex or sensory loss in his lower extremities.  (Id.)

---

[6]There was documentary evidence and testimony that this identification restricted where and with whom Plaintiff could live and with whom he could socialize.

The ALJ next considered Plaintiff's residual functional capacity. (Id. at 15-17.) In assessing this capacity, the ALJ evaluated Plaintiff's credibility. (Id. at 16-17.) Weighing against his credibility were the lack of any supporting objective medical evidence and any limitations on his activities by his treating physicians. (Id.) The ALJ also noted that the records indicated that Plaintiff worked as a welder when in prison.[7] (Id. at 17.) The ALJ concluded that Plaintiff had the residual functional capacity to occasionally lift 25 pounds, frequently lift 15 pounds, occasionally carry 20 pounds, and frequently carry 15 pounds, but needed an alternate sit/stand option with no regular stooping, bending, squatting, or climbing of stairs. (Id.) Plaintiff could not return to his past relevant work; however, according to the VE, there were jobs Plaintiff could perform with these limitations and with his transferable skills of welding, painting, and assembly. (Id.)

Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his

---

[7]Plaintiff worked as a welder in prison in 1990, and not, as found by the ALJ, after his disability onset date. (See Record at 835.)

previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of

pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000) (same); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998) (same).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet

her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

Additionally, the Commissioner has implemented regulations dealing specifically with mental impairments. See **Pratt v. Sullivan**, 956 F.2d 830, 834 (8th Cir. 1992) (citing 20 C.F.R. §§ 404.1520a, 404.1520a(a)). The regulations require the completion of a standard document titled "Psychiatric Technique Review Form" ("PRTF"), which is essentially a checklist that tracks the requirements of the Listings of Mental Disorders. See 20 C.F.R. § 404.1520a(e). See also **Montgomery v. Shalala**, 30 F.3d 98, 99 (8th Cir. 1994) (citing 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1)). At the hearing level, the ALJ must incorporate the pertinent findings and conclusions into his or her written decision. 20 C.F.R. § 404.1520a(e)(2). "Th[is] decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." Id.

The first step in completing a PRTF is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. See **Pratt**, 956 F.2d at 834 (citing 20 C.F.R. §§ 404.1520a, 1520a(b)(1)). These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. See **Id.** at 835. If a mental impairment is found, the affect of the impairment on a claimant's ability to work must be analyzed. See **Id.** This analysis requires the rating of the degree of functional loss resulting from the impairment in

four areas of function which are deemed essential to work: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The first three categories are rated on a five point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The last category is rated on a four-point scale of none, one or two, three, four or more. Id.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

<u>**Discussion**</u>

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ erred by (a) not properly evaluating Plaintiff's and his wife's credibility; (b) concluding that Plaintiff's pain would respond to pain relief medications and therapy; and (c) not including all his impairments in the hypothetical question posed to the VE. The Commissioner disagrees.

<u>Credibility.</u> As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting <u>Lowe</u>, 226 F.3d at 972). "The ALJ need not explicitly discuss each <u>Polaski</u> factor." **Strongson**, 361 F.3d at 1072. "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." **Id.** <u>Accord</u> **Lowe**, 226 F.3d at 972.

In the instant case, the ALJ evaluated Plaintiff's credibility and discounted it based on several <u>Polaski</u> factors, including the lack of supporting objective evidence. This omission is a proper consideration. <u>See</u> **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her

complaints). The ALJ also properly considered the lack of any restrictions placed on Plaintiff's activities by his treating physicians when evaluating the severity of his symptoms. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physical restrictions placed on claimant by physician militated against finding of total disability); **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (subjective complaints of pain were properly discounted on grounds that, inter alia, they were inconsistent with absence of medically ordered commensurate restrictions on claimant's activities); **Shelton v. Chater**, 87 F.3d 992, 996 (8th Cir. 1996) (record supported statements concerning pain as a general matter but not to severity and degree of which claimant complained; recommendations of doctors were devoid of any restrictions and were of conservative treatment; and limited activities were result of lifestyle choices, not medically necessitated limitations); **Brown v. Chater**, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions was inconsistent with complaints of pain).

Additionally, there were inconsistencies in the record. For instance, Plaintiff first testified that he had the appetite to eat only one meal a day. He later described eating lunch and breakfast and, if it was available, fruit. He complained of back pain and pain in his right hip and knee, but was never observed with an abnormal gait or having any difficulty walking. On one day, he told a doctor that he had a poor appetite and also told a therapist that his appetite was fine. He testified that surgery was not performed to correct his urinary problems because of a heart problem. The records indicate, however, that the surgery was first not performed because he refused to proceed with a local anesthesia as recommended

but insisted on a general anesthesia and the general anesthesia could not be administered because of his bradycardia.  The bradycardia was resolved; however, the referring doctor then concluded that the surgery was not necessary.

At issue in the present case is not whether Plaintiff suffers pain, but whether that pain precludes him from substantial gainful activity.  The ALJ determined that the only support in the record for Plaintiff's argument that he could not work was his description of how the pain limited his activities.  This determination is supported by the record.[8]

<u>Response to Treatment.</u>  Plaintiff next argues that the ALJ erred by finding that his pain was relieved by medication and therapy.  This argument is unavailing.

Substantial evidence in the record as a whole supports the ALJ's finding.  Although Plaintiff testified, and sometimes reported, that his pain was constant, the record shows that the pain was relieved by the appropriate medication properly taken.  In June 2000, Plaintiff reported no complaints.  Three months later, he reported that he was okay as long as he had his medication.  A physical examination performed that same month was normal.  In September, Plaintiff continued to report that he was doing fine.  In November 2001, he reported that his mood, energy, concentration, and appetite were all good.  Once released

---

[8]The undersigned notes that Plaintiff's wife also testified that he was always in pain.  The ALJ did not delineate his reasons for discounting her testimony.  Although such a delineation is preferable, see **Reynolds v. Chater**, 82 F.3d 254, 258 (8th Cir. 1996), the lack of one is not grounds for reversal if the ALJ's adverse decision is otherwise supported by substantial evidence, see **id.**; **Bates v. Chater**, 54 F.3d 529, 532-33 (8th Cir. 1995).  Moreover, Plaintiff's wife's testimony about how hard she was working and how little he was made clear her financial interest in the case.  See **Novotny v. Chater**, 72 F.3d 669, 671 (8th Cir. 1995) (finding claimant's wife's financial interest in her husband's applications for disability benefits to be a proper consideration by the ALJ when assessing her credibility).

from prison, Plaintiff sought medical help less frequently than when in prison and primarily for a renewal of his medications.

Hypothetical Question to the VE.  In his final argument, Plaintiff contends that the ALJ erred in his hypothetical question to the VE because it did not include all his limitations, specifically his need to urinate frequently and his crying spells.

"A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Accord **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 145, 1148 (8th Cir. 2001).

In the instant case, the ALJ included only those limitations that he found supported by the record; the additional limitations were properly rejected by the ALJ as discussed above.  See  **Strongson**, 361 F.3d at 1073 (concluding that ALJ's hypothetical question properly included only the impairments the ALJ found credible); **Harris v. Barnhart**, 356 F.3d 926, 930 (8th Cir. 2004) (finding no error in ALJ's hypothetical question to VE that did not include limitations described by claimant on grounds that ALJ had also not erred in discounting those limitations); **Pearsall**, 274 F.3d at 1220 (rejecting challenge to hypothetical question that did not include limitations found by treating physician that were properly discounted by ALJ).  Plaintiff's argument to the contrary is without merit.

## Conclusion

For the foregoing reasons, the undersigned finds that there is substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision, to support the ALJ's conclusion that Plaintiff is not disabled within the meaning of the Social Security Act. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of September, 2005.